# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| YORK SCHOOL DEPARTMENT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:13-cv-00042-NT |
| | ) |
| S.Z., on her own behalf and on | ) |
| behalf of her minor son, P.Z., | ) |
| | ) |
| Defendant. | ) |

## ORDER ON PLAINTIFF'S IDEA APPEAL

P.Z., a student from York, Maine, is diagnosed with a learning disability that entitles him to receive a special education under the Individuals with Disabilities Education Act (the "**IDEA**"). S.Z. is P.Z.'s mother.

In the summer of 2011, before the start of P.Z.'s tenth grade school year, S.Z. removed P.Z. from York High School, a public high school administered by the York School Department (the "**Department**"), and placed him in Eagle Hill School in Hardwick, Massachusetts, a private residential school for students with learning disabilities. S.Z. later filed an IDEA complaint with the Maine Department of Education seeking an order requiring the Department to reimburse S.Z. for P.Z.'s tuition at Eagle Hill for the tenth and eleventh grades. In November of 2012, a Maine due process hearing officer ("**DPHO**") granted S.Z.'s petition.

Before the Court is the Department's suit challenging the DPHO's decision. For the reasons stated below, the Court **SUSTAINS** the DPHO's conclusion that the Department failed to make a free appropriate public education available to P.Z. for

the tenth and eleventh grades and that S.Z. is entitled to be reimbursed for P.Z.'s tuition at Eagle Hill for those two years. The Court reaches no other issues.

## FACTUAL BACKGROUND

### I.    Early Education

During the 2002-2003 school year, when P.Z. was seven years old and attending first grade, the Department determined that he suffered from a speech and language impairment and was eligible to receive special education and related services under the IDEA. R. 901, 1267. Described in greater detail below, the IDEA is a federal law which requires local school districts in states that receive federal educational funding to make a "free appropriate public education" available to all qualifying disabled children who live within their borders. *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 58 (1st Cir. 2002). Generally, the IDEA requires school officials to meet with the parents of a disabled child each year to create an "individualized education program" ("**IEP**") and to provide the child's education according to the IEP's terms. *See* 20 U.S.C. §§ 1401(9), 1412(a), 1414(d).

During the 2005-2006 school year, when P.Z. was in fourth grade, P.Z. underwent psycho-educational testing. R. 901. Based on P.Z.'s results on the Wechsler Intelligence Scale for Children-IV ("**WISC-IV**") assessment, examiner Daniel Scuccimarra concluded that P.Z. fell in the "average" range for perceptual reasoning and in the "low average" range for verbal comprehension, working memory, and processing speed. R. 903.

As P.Z. progressed through school, he began to have more academic difficulties. R. 1267. S.Z. spent about ninety minutes a night helping P.Z. through his homework during the 2007-2008 school year, when P.Z. was in sixth grade. R. 1267. According to S.Z., P.Z.'s "reading was awful" and his "math was horrendous." R. 1267. Notes from P.Z.'s November 16, 2007 IEP team meeting indicate that P.Z. was struggling with a wide variety of organizational tasks, including maintaining his plan book and completing his homework. R. 89. A WISC-IV assessment conducted by Kerry Hoag in January of 2008 found that P.Z.'s processing speed had fallen to the "borderline" range. R. 885.[1]

S.Z. hired a private tutor to work with P.Z. for a couple hours a week during the summer before the 2008-2009 school year, when P.Z. entered the seventh grade. R. 1269-70. She also hired a private math tutor to work with P.Z. twice a week during the school year, for sixty to ninety minutes a session. R. 1270. Despite these efforts, seventh grade was a "disaster from day one," according to S.Z. R. 1270. The Department's teachers demanded significantly more work of P.Z. than he could keep up with, especially in math class. R. 1270. S.Z. now spent hours a night helping P.Z. with his homework. R. 1270. His academic struggles were taking an emotional toll. At times, P.Z. would come home crying and ask his mother why his brain did not work. R. 1270.

---

[1]     P.Z.'s scores for verbal comprehension, working memory, and perceptual reasoning remained in the "average" range. R. 885.

In advance of P.Z.'s December 2008 IEP meeting, S.Z. communicated her frustrations about P.Z.'s "ongoing struggle to know and understand the expectations of his teachers and the assignments he has" with school officials. R. 126. S.Z. requested that P.Z.'s teachers provide P.Z. written instructions for his assignments and that they communicate with S.Z. about any longer projects they planned to assign. R. 126. P.Z.'s new IEP included a single general organizational goal, that P.Z. "use adaptive strategies, organization and self-advocacy skills to maintain a plan book, complete assignments, ask for help and participate in class with average success." R. 872.

In March of 2009, P.Z. took the Maine Educational Assessment and received a "does not meet standards" score in math and a "partially meets standards" score in reading. R. 131, 1271. At P.Z.'s May 2009 IEP meeting, S.Z. told IEP team members that P.Z. was still struggling. R. 870. P.Z.'s IEP team noted that P.Z. was having difficulty with "executive functioning skills for organizing information" and that his slow processing speed was making it hard for him to keep up in all his classes, particularly math. R. 871-72. Both S.Z. and P.Z.'s classroom teacher suggested P.Z. needed "significantly more support than he has received." R. 879. On P.Z.'s end-of-the-year report card, he received an F in math and D's and C's in the rest of his subjects. R. 869.

## II.     Eighth Grade

### A.     September 2009 until April 2010 IEP Meeting

According to S.Z.'s testimony, the 2009-2010 school year, when P.Z. was eighth grade, started off better. R. 1272. P.Z. had a good attitude about school and would

4

usually come home with his assignments written down. R. 1272. S.Z. testified that she had "much better cooperation" with P.Z.'s teachers than in the past. R. 1272. For the first time, the Department introduced "Visualizing and Verbalizing" ("**V & V**") into P.Z.'s programming, an educational technique geared toward improving reading comprehension. R. 1291. Educator Michelle Smith provided the instruction. R. 1272. Under the V & V method, students with language comprehension disabilities are instructed in "visualiz[ing] written and oral language," which allows them to better "grasp concepts and . . . retrieve them later on." R. 1360.

S.Z. continued to work with P.Z. extensively after school. R. 1272. A letter documenting P.Z.'s December 2009 IEP meeting reported that S.Z. was "very pleased with [P.Z.'s] progress this year." R. 862. S.Z. later testified that she had meant she was pleased with P.Z.'s educational team, not that she thought P.Z. was making real academic progress. R. 1272. At this meeting, the IEP team discussed P.Z.'s transition to high school but decided to postpone any final decisions until the spring. R. 861.

In March of 2010, P.Z.'s educators assessed P.Z.'s progress toward the goals listed in his IEP. R. 838. They listed his progress on his overall organizational goal— "to use adaptive strategies, organization and self-advocacy skills to maintain a plan book, complete assignments, ask for help and participate in class with average success"—as "adequate." R. 838.

On April 12, 2010, Maxene Feintuch, a speech-language pathologist employed by the Department, conducted a one-hour, in-class observation of P.Z. R. 138. She noted that P.Z. was "less organized and prepared than his classmates." R. 138. For

instance, she observed, P.Z.'s "laptop was not charged, so it took a long time to get set up" and his "classmates were working and taking notes 10-15 minutes before he was." R. 138. Feintuch concluded that "difficulties with organization and attention impact [P.Z.'s] ability to listen, process information and complete tasks with success" and that P.Z. "sometimes misinterprets questions." R. 139. In her follow-up report, Feintuch offered the following recommendations:

> [P.Z.] requires instruction and compensatory strategies to learn executive function skills and possibly direct support for pre-teaching, checking his work, checking his plan book, and helping him complete assignments. He needs frequent checks for understanding. He needs to learn how to attend, listen to, and interpret questions.

R. 139.

## B.     The April 2010 IEP

P.Z.'s IEP team met in April of 2010 to prepare for P.Z.'s transition to York High School. R. 835-44. The IEP developed in that meeting (the "**April 2010 IEP**") indicated that S.Z. "continues to have concerns with P.Z.'s organization skills," but was "happy with the progress [that P.Z.] is making this year especially in language arts." R. 836.

The April 2010 IEP provided for P.Z. to spend eighty minutes a day in a resource room study hall and to receive speech and language services from a speech-language pathologist thirty minutes a week. R. 838-39. The team increased P.Z.'s time in what the Department classifies as "mainstream" education, as opposed to special education, from 52% to 76% of his school day. R. 840. The IEP also called for P.Z. to receive a number of "supplementary aids and services," including in-class support during his social studies and science courses. R. 839. The IEP listed nine

annual goals, three concerning reading comprehension, five concerning math, and the same organizational goal that appeared in P.Z.'s seventh and eighth grade IEPs. R. 119, 837-38, 854. The IEP also noted that P.Z.'s long-term goal was to attend a two or four-year post-secondary school, though a post-IEP meeting notice sent to S.Z. indicated that "[P.Z.] plans to attend a 4 year postsecondary school after YHS." R. 841, 846. S.Z. told school officials that she agreed with the proposed IEP. R. 1274.

The post-IEP-meeting notice the Department mailed to S.Z. also sketched out P.Z.'s freshmen year schedule. R. 846. The IEP team agreed that the Department should enroll P.Z. in general-level English and Pre-Algebra, but college prep Physical Science and Western Civilization. R. 846. At York High School, there are four tracks of classes offered to the general population of students: (1) advanced placement courses; (2) honors courses; (3) college prep courses; and (4) general-level courses. R. 1299. College prep courses move more quickly and require a higher degree of independence than general-level classes, which are "geared for slower learners who need a little bit more support." R. 1299, 1368. General-level courses are not offered in to students in their junior and senior years. R. 1299. The expectation is that all of the students in general-level courses will move into college prep courses by their junior year. R. 1299.

### C. Eighth Grade Assessments, Remainder of Eighth Grade School Year, and Summer of 2010

The Department administered Northwest Evaluation Association ("**NWEA**") tests two times during eighth grade. The following chart shows P.Z.'s raw and percentile scores:

|  |  | Fall 2009 | Spring 2010 |
|---|---|---|---|
| **Mathematics** | *Score* | 217 | 211 |
|  | *Percentile* | 22 | 9 |
| **Reading** | *Score* | 200 | 213 |
|  | *Percentile* | 10 | 26 |
| **Language Usage** | *Score* | 208 | 219 |
|  | *Percentile* | 21 | 43 |

R. 730. The Department also administered the New England Common Assessment Program ("**NECAP**") test in the fall, though the record indicates S.Z. did not receive P.Z.'s scores until June of 2010. R. 867, 1273. On the NECAP, P.Z. received scores of "substantially below proficient" in both reading and math. R. 867.

P.Z.'s end-of-year eighth grade report card was issued in June of 2010. R. 834. Generally, P.Z. received a mix of A's, B's, and C's, including grades in the "A" range for math for the last two-thirds of the year. R. 834. His eighth grade marks were considerably better than his marks had been for the seventh grade. R. 834, 869. P.Z.'s educators also evaluated his progress toward achieving his IEP goals. R. 844. They reported that P.Z. was "secure" in meeting his annual organizational goal. R. 843-44.

After receiving P.Z.'s NECAP scores, S.Z. concluded that the Department's efforts were not working. R. 1273. She testified that that P.Z. "was making no gains" and "wasn't learning any strategies to give him the ability to be independent . . . ." R. 1274. S.Z. had also begun to doubt whether P.Z.'s grades accurately reflected his academic achievement. R. 1274.

During the summer of 2010, S.Z. hired an educational advocate named Lisa Sampson to help her marshal educational resources for P.Z. R. 1275. Sampson

recommended S.Z. have P.Z. reevaluated. R. 1275. S.Z. hired psychologist Marilyn Engelman, Ph.D., to evaluate P.Z. R. 1275. Engelman conducted a diagnostic evaluation with P.Z. on August 27, 2010 and September 1, 2010. R. 810. Its content is discussed in greater detail below.

## III. Ninth Grade

### A. September 2010 until December 2010 IEP Meeting

P.Z. began classes at York High School in September of 2010, and was enrolled in the courses his IEP team had suggested, except he was placed in general Science rather than the recommended college prep Physical Science course. R. 734, 1275. The only way P.Z. could have been enrolled in college prep Physical Science is if he had also been enrolled in college prep Algebra I, but his teachers did not feel he was ready for Algebra I. R. 1275. A regular education teacher, Ms. Cyr,[2] taught P.Z.'s general-level Science class. R. 240, 1348. The class included seven students, all of them on IEPs. R. 240.

Special education teacher Mike Martin taught P.Z.'s general-level Pre-Algebra class, which was made up of five students, all of them on IEPs. R. 239, 1346. Regular education teacher Sarah Straz and special education teacher Carmen Lauritsen-Keegan co-taught P.Z.'s general-level English class, which included eight students, all of them on IEPs. R. 240, 1366-67. Rounding out P.Z.'s core curriculum, regular education teacher Steve Freeman instructed his college prep Western Civilization

---

[2] The Court uses honorifics such as "Ms." to refer to individuals whose first names are not readily apparent in the record.

class, which included 17 students, many of whom were not on IEPs. R. 239, 1301. P.Z. was also enrolled in a number of electives, including Chorale and Computer Skills. R. 734. Ed tech Allison Zurlo attended P.Z.'s Pre-Algebra, Science and English classes, though her responsibilities during those periods included assisting not just P.Z., but also other students with IEPs. R. 1306-07.

To provide additional support for P.Z. in his classes, special education teacher Heidi Dufresne met with P.Z. for eighty minutes every other day, working one-on-one with P.Z. on his schoolwork for half of the period and working with P.Z. and two other students on V & V for the other half of the period. R. 1361. Dufresne had earlier completed a three-day course in the V & V method. P.Z. R. 1308. On the days P.Z. did not meet with Dufresne, he received eighty minutes of guided study time with an ed tech, though it is unclear from the record whether the assigned ed tech was Zurlo or Silke Brunelle.[3]

Martin, P.Z.'s math teacher, also served as his IEP case manager. R. 1346. In that role, Martin was responsible for working with P.Z.'s other teachers to make sure they were providing the accommodations P.Z. needed and were aware of S.Z.'s concerns. R. 1346. When asked how P.Z.'s educators coordinated their efforts, Martin testified that the majority of P.Z.'s teachers had their classrooms in the same area of the school and naturally stayed in close contact with one another. R. 1350. Martin also testified that he and Cyr, the general-level Science teacher, met twice a week to

---

[3]     Macri testified that Zurlo was the assigned ed tech. R. 1293. Martin and Lauritsen-Keegan testified that Brunelle was the assigned ed tech. R. 1356, 1375-76.

ensure that Pre-Algebra and Science were taught in complimentary ways. R. 1347-48.

By October, S.Z. was again concerned that P.Z. was struggling in school, especially in Western Civilization, in which P.Z. had failed two quizzes. R. 1275. The Department had not assigned an ed tech to attend Western Civilization and, according to S.Z., P.Z. was not writing down his assignments. R. 1275, 1351. S.Z. wrote an e-mail to Freeman, the Western Civilization teacher, to express her concerns. R. 150, 1275. In his reply, Freeman wrote that P.Z. was having difficulty because "he apparently isn't reading the assignments in the text or he isn't bothering to review the questions at the end of each section he has read before we have class." R. 151. Feintuch, P.Z.'s speech-language pathologist, observed P.Z.'s Western Civilization course on October 19, 2010. R. 155. Feintuch noted that P.Z. "put his head down for a while" but was "attentive for most of the class." R. 155. In the first quarter of the year, P.Z. received an A- in English, a C+ in Science, an A in Pre-Algebra, a D in Western Civilization, and a B+ in Computer Skills. R. 734.

On November 17, 2010, Sampson, S.Z.'s educational advocate, sent Macri, the Department's special education director, a copy of the psycho-educational evaluation Engelman had prepared after assessing P.Z. at the end of the summer. R. 803-04, 810-33. Engelman's testing showed that P.Z.'s WISC-IV scores had fallen in every category since his last evaluation in January of 2008. R. 814, 885. Most dramatically, P.Z.'s processing speed score had fallen to the first percentile. R. 814. The following chart shows P.Z.'s WISC-IV scores over time:

|  |  | Jan. 2006 (Scuccimarra) | Jan. 2008 (Hoag) | Sept. 2010 (Engelman) |
|---|---|---|---|---|
| **Verbal Comprehension** | *Standard Score* | 81 | 95 | 89 |
|  | *Percentile* | 10 | 37 | 23 |
|  | *Qualitative* | low avg. | avg. | low avg. |
| **Perceptual Reasoning** | *Standard Score* | 100 | 98 | 94 |
|  | *Percentile* | 50 | 45 | 34 |
|  | *Qualitative* | avg. | avg. | avg. |
| **Working Memory** | *Standard Score* | 86 | 99 | 94 |
|  | *Percentile* | 18 | 47 | 34 |
|  | *Qualitative* | low avg. | avg. | low avg. |
| **Processing Speed** | *Standard Score* | 83 | 73 | 65 |
|  | *Percentile* | 13 | 4 | 1 |
|  | *Qualitative* | low avg. | borderline | not specified |

R. 814-15, 885, 903.

Engelman performed a number of other assessments as well, including the Woodcock-Johnson Pyscho-Educational Battery, Third Edition ("**WJ-III**"), the Comprehensive Test of Phonological Processing, the Grey Oral Reading Test, Fourth Edition ("**GORT-4**"), the Test of Reading Comprehension, Fourth Edition ("**TORC-4**"), and the Test of Written Language, Fourth Edition ("**TOWL-4**"). R. 813. She summarized her findings as follows:

> . . . . [P.Z.'s] profile indicates that he is fluctuating between the average and low average range of cognitive ability. [P.Z.] does best with concrete materials and when material is broken down into small discrete steps. He does well when he can relate the material to his everyday life. [P.Z.] has more difficulty organizing material and understanding more abstract or inferential concepts. He does well with verbally mediated instructions, which are repeated. Processing speed is an area of significant weakness. As [P.Z.] processes information extremely slowly, he misses out on main ideas and details, especially in a classroom environment. Because of his slow processing speed and expressive and receptive language difficulties, [P.Z.] has difficulty, not only expressing

his thoughts, but receptively taking in the information at a rate commensurate with his same age and grade peers. It is at these times that [P.Z.] becomes overwhelmed and somewhat anxious as [he] realizes that he is missing information.

[P.Z.]'s anxiety plays a large role in his feeling of becoming overwhelmed. At times, [P.Z.] does not read visual cues and needs verbal explanations. He has more difficulty in unstructured situations, whether they are in the academic or social realm as he does not understand the subtleties of language. Thus, [P.Z.] would do best in small classes with peers of similar cognitive abilities. [P.Z.], therefore, will do best in classes where teachers are trained and understand working with students with expressive and receptive language difficulties and learning issues. He needs placement in language-based classes where teachers are trained and certified in working with students with [P.Z.'s] profile. [P.Z.] wants to do well but has difficulty keeping up with his same age and grade peers.

R. 825-26.

Engelman recommended that P.Z. be placed in classes with a student-teacher ratio of no more than 10:1 and that he only work with teachers trained in teaching students with learning disabilities similar to his own. R. 826. Engelman also specified a number of "language-based teaching strategies" that she advised be incorporated into P.Z.'s education, including reviewing previously learned information, "pre-teaching" vocabulary and key concepts before in-class lessons, using graphic organizers and outlines, and accompanying each assignment with directions that explain the assignment's objective and break the assignment down into small, concrete tasks. R. 827.

Engelman believed that the programming called for by P.Z.'s April 2010 IEP was not adequate because it lacked consistency. R. 1183. She testified that his IEP seemed to provide "modifications or accommodations . . . within the classrooms"

rather than the more immersive, comprehensive "language-based" approach he needed. R. 1184.

Feintuch, the Department's speech-language pathologist, again observed P.Z. on December 4, 2010, this time in an elective Computer Skills course. R. 800. In a post-observation report, Feintuch noted that P.Z. did not produce any work for the first twenty minutes of class and failed to ask for any help. R. 800. She concluded that "[w]ithout direct instruction, 1:1 attention, and help with reading, [P.Z.] withdraws and is less productive. He may not access the curriculum as fully as others." R. 800. In the final paragraph of her report, captioned "Recommendations specific to this observation," Feintuch wrote the following:

> [P.Z.] would benefit from:
> - instruction in reading comprehension strategies.
> - support in study halls to review and prepare for classes.
> - pre-teaching, pre-reading instruction to improve his comprehension.
> - frequent check-ins by teachers to clarify and re-teach.
> - opportunities for success that boost self-esteem and reduce anxiety.

R. 800.

## B.    December 2010 IEP

The Department scheduled a December 9, 2010 IEP meeting to revise P.Z.'s IEP. R. 788. In advance of the meeting, S.Z. prepared a list of fourteen concerns she had about P.Z.'s programming. R. 796. Among her critiques were that P.Z. was not able to work independently, that P.Z. was not being "pre-taught" his lessons, that P.Z.'s educators were not reviewing previously learned lessons, that P.Z. had "not developed skills or strategies to learn and remember information," that there was too

much disruption in P.Z.'s English class, and that S.Z. continued to have to spend several hours each night and weekend assisting P.Z. with his homework. R. 796. S.Z. wrote that she was "concerned that [P.Z.'s] current path does not prepare him for a post-secondary education, independent living and employment." R. 796. S.Z. concluded by noting that "[P.Z.] still enjoys going to school," but that she could "see a little negativity coming into play." R. 796.

At the meeting, the team reviewed S.Z.'s concerns, Feintuch's in-class observations, and Engelman's evaluation. R. 789. Concluding that "[P.Z.] is making progress in the general education curriculum," the team rejected Engelman's suggestion that P.Z. be placed exclusively in classes taught by special education teachers with 10:1 student-teacher ratios or lower. R. 789. The new IEP provided that P.Z. would continue to receive specialized reading instruction for 40 minutes every other day, speech and language services for 30 minutes a week, and alternating 40 minute and 80 minute periods of guided study in the resource room. R. 780, 788. It also provided that P.Z. would receive in-class support in his science, social studies, math and language arts classes. R. 781, 788. The new IEP also listed more

organizational goals[4] and more supplementary aids, services, and modifications[5] than P.Z.'s previous IEPs. R. 781-82, 787. It included no provision for after-school supportive services. *See* R. 776-87, 1311.

## C. Remainder of Ninth Grade Year

P.Z. finished his first semester at York High School with a B in English, a B in Science, a C in Pre-Algebra, an A- in Computer Skills, a B in Health, and a D+ in Western Civilization. R. 734.[6]

---

[4]    For instance, the IEP included the following five "measurable annual goals":

Given instruction and strategies for reading comprehension and study skills [P.Z.] will improve his comprehension of written text to be within the average range.

Given instruction and strategies for organizing, developing and writing his ideas, [P.Z.] will improve his ability to develop a written piece that executes his ideas in a concise, coherent fashion.

Given instruction and strategies for solving math problems [P.Z.] will improve his ability to develop and implement problem solving strategies by solving multistep problems with fading assistance.

Given instruction and strategies for organization and self-advocacy [P.Z.] will maintain a plan book, complete assignments, ask for help and participate in class with average success.

[P.Z.] will demonstrate an understanding of strategies for improving reading and listening comprehension, including visualization, pre-reading questions and post-reading summarizing, utilizing textbook drawings, maps, and highlighted material, in the context of a content-area course, as measured by average or better assignment grades.

R. 786.

[5]    Among other things, the new IEP called for P.Z.'s teachers to check P.Z.'s comprehension of information he received orally, summarize extended class discussions, require P.Z. to paraphrase instructions, give P.Z. only one or two sets of directions at a time, and couple oral information with written instructions. R. 782.

[6]    A detailed grade break-down from P.Z.'s Pre-Algebra course, dated January 20, 2011, indicates that P.Z. failed a chapter test administered on December 7, 2010 and failed a quiz administered on January 4, 2011, but largely earned weekly A+ grades for "class participation." R. 208.

In keeping with his new IEP, an ed tech, Ms. Bando, was placed in P.Z.'s Western Civilization class during the second semester of the school year. R. 1351, 1356-57. Dufresne also started focusing on Western Civilization for the 40 minutes of guided study time she spent with P.Z. every other day. R. 1351, 1361.

At about this time, P.Z.'s English teachers, Straz and Lauritsen-Keegan, decided to merge their eight-student ninth grade class with an eight-student tenth grade class taught by a regular education teacher named Ms. Cowan. R. 1366. After this adjustment, there were three teachers and two ed techs in the room with sixteen students. R. 1366. According to Straz, the change allowed the teachers more flexibility to group students based on ability and interest. R. 1366. After the change, P.Z. spent a substantial amount of time in a "Literature Circles" break-out group led by an ed tech. R. 1377.

On January 14, 2011, S.Z. and Sampson wrote a letter to Macri stating that S.Z. was accepting the services that the Department had offered in the December 2010 IEP even though she felt that the IEP was inappropriate to address P.Z.'s needs. R. 774. Noting that the IEP called for P.Z. to "be included with his non-disabled peers for 89% of the school day," she claimed the IEP lacked the "intensity of needed special education services." R. 774. S.Z. requested that the IEP be amended to incorporate Engelman's recommendation that P.Z. be placed only in classes with 10:1 or lower student-teacher ratios taught by "teachers who are certified and trained in working with students with significant language-based learning difficulties." R. 774-75.

At around this time, S.Z. and P.Z. visited a number of private boarding schools that educate students with learning disabilities, including Eagle Hill School, a boarding school in Hardwick, Massachusetts, and Middleton, a boarding school in Rhode Island. R. 1187, 1280, 1289. S.Z. was impressed with Eagle Hill School, and P.Z. appeared more comfortable there than at Middleton. R. 1280. P.Z. and S.Z. also visited some schools closer to home, including Aucocisco, in Portland, Maine, and the Learning Skills Academy, near Portsmouth, New Hampshire. R. 1286, 1289. S.Z. concluded that neither Aucocisco nor the Learning Skills Academy would be appropriate for P.Z. R. 1286.

In March, Engelman spent a day observing P.Z. at York High School. R. 239, 1185-86. Engelman noted that Freeman, P.Z.'s Western Civilization teacher, told her that P.Z. "needed steps shown to him many times," "needed his work reviewed," and "needed review and repetition again as he had difficulty understanding the concepts." R. 239. Engelman also noted that she was "informed that [P.Z.] did not participate in class" and "often had his head down," but that he would complete tasks asked of him "as long as he had on-going support from his teacher." R. 239. Engelman also observed P.Z.'s Pre-Algebra, Science, and English classes, V & V instruction period, guided study hall, and Chorale elective. R. 239-40. Engelman concluded that P.Z.'s educational programming lacked continuity and organizational consistency. R. 242. She found that the V & V instruction P.Z. received from Dufresne was "not carried over into his English, History, or Science class[es]." R. 242.

On May 5, 2011, S.Z. wrote Macri an e-mail expressing her continued concern about P.Z.'s difficulties at York High School. R. 918. She wrote that P.Z. "becomes frustrated at home when he can't translate what he heard/learned in class" and that he "needs a lot of guidance from me with his projects." R. 918. She also worried that the Department was not implementing Engelman's recommendation that P.Z. receive language-based instruction across all his subject areas. R. 918.

P.Z.'s grades for the second half of the year were somewhat better than his mid-year grades. R. 734. He received a B in English, a B- in Science, a B in Pre-Algebra, a C+ in Western Civilization, a B+ in Health, and an A- in Chorale. R. 734.[7] As in previous years, the Department administered the NWEA assessment in both the fall and spring of P.Z.'s ninth grade year. R. 730. The following table shows P.Z.'s scores:

|  |  | Fall 2010 | Spring 2011 |
|---|---|---|---|
| **Mathematics** | *"RIT" Score* | 199 | 219 |
|  | *Percentile* | 2 | 18 |
| **Reading** | *"RIT" Score* | 215 | 222 |
|  | *Percentile* | 34 | 48 |
| **Language Usage** | *"RIT" Score* | 212 | 213 |
|  | *Percentile* | 26 | 26 |

R. 730.

P.Z.'s teachers testified that P.Z. was engaged in his own education and made meaningful academic gains throughout his ninth grade year. R. 1303, 1305, 1349,

---

[7]    Macri testified she did not know how P.Z.'s teachers arrived at their grading decisions. R. 1310. Her testimony did not provide a clear picture of how, or whether, the Department assesses students with IEPs differently than students without IEPs. *See* R. 1310.

1370. They claim that P.Z. remained on track at the close of the year to attend a four-year college. R. 1306, 1350, 1353, 1359, 1369. They also claimed that P.Z. thrived socially at York High School. R. 1297-98, 1303, 1348, 1368-70. They noted that P.Z. was a valued member of the school's popular cross-country team and that P.Z. landed a leading role in the school play in the spring, bringing the house down with his performance. R. 1297-98, 1303, 1348, 1368-70.

Engelman testified that P.Z. was not on track to go to college because "he had not learned any independent strategies or organizational tasks to become more of an independent learner." R. 1184. According to S.Z., the web page for the University of Maine at Orono indicated that "four years of strong college prep English courses or . . . higher" are required for admission. R. 1379. Further, a University of Maine at Orono representative told S.Z. that P.Z.'s placement in general-level English might present a bar to admission unless he took a remedial college prep English class over the summer. R. 1379.

In June of 2011, S.Z. made the final decision to send P.Z. to Eagle Hill School for the tenth grade. R. 256, 1281-82. She wrote Martin an e-mail to inform him of her decision. R. 915. On June 14, 2011, Macri received a formal letter from S.Z. stating that she had "decided to reject as inappropriate the IEP and placement that have been offered to [P.Z.] for the upcoming 2011-2012 school year." R. 770. In the letter, S.Z. stated her rationale in detail:

> The proposed program is simply not sufficient to address the range of educational needs arising from [P.Z.'s] disability, as outlined in detail by Dr. Engelman's report. Further, the proposed placement at York High School has proved to be highly inappropriate for [P.Z.] as demonstrated

by the significant difficulties he has encountered in that setting. He requires a highly-structured, language-based classroom with a low student-teacher ratio, an integrated curriculum, and teachers specifically trained in working with students with significant language-based learning difficulties and experienced in addressing the various issues presented by his learning disability profile.

R. 770. S.Z. further informed Macri that she would be seeking compensation for P.Z.'s tuition at Eagle Hill School. R. 770.

Macri wrote back to S.Z. on June 27, 2011 to thank S.Z. for providing notice of her decision and to inform S.Z. that P.Z.'s "IEP continued to be in place during the 2010-2011 school year and will be in place for 2011-12 if you decide to have [P.Z.] return to YHS." R. 766. At the close of the letter, Macri asked S.Z. to let her know if she wanted to have an IEP team meeting to review P.Z.'s IEP and proposed placement. R. 766.

## IV.  Tenth Grade

### A.  Eagle Hill School's Academic Program

Eagle Hill, where S.Z. enrolled P.Z. for his tenth grade year, focuses exclusively on educating students with identified learning disabilities. R. 1208. According to Patrick Riendeau, Eagle Hill's academic dean, all of the school's students have "significant difficulty in academic achievement." R. 1209.

About two-hundred students attend Eagle Hill, the great majority of whom board in the school's dormitories. R. 1208. The school's faculty includes both full-time teachers, who generally work during the day and stay on campus until 9:00 p.m. one evening a week, and full-time "resident life faculty," whose primary responsibilities include working with students during the evening. R. 1209. Each student arriving at

Eagle Hill is assigned an academic advisor, who remains with them from year to year. R. 1216. The academic advisor is responsible for "keeping a higher level picture of the student's progress" and coordinating communication between the student's parents, teachers, and home school district. R. 1216. An educator at Eagle Hill typically serves as academic advisor to about ten students at a time. R. 1224.

Under Eagle Hill's boarding program, students have a "study hall" each evening from 6:30 to 8:00 p.m., in which they complete their homework in their dorm rooms with guidance and supervision from on-duty teachers and resident counselors. R. 1214. Faculty members keep up on students' homework by accessing a website where teachers post their assignments. R. 1214. Students arriving at Eagle Hill are required to keep their doors propped open during evening study hall and keep the on-duty faculty apprised of how they are spending their time. R. 1214. If a student is regularly completing homework and staying organized, the student's advisor may place the student on "self-study" status. R. 1214. Students who have earned this status are allowed to vouch for their own homework completion and keep their doors closed. R. 1214.

Under Eagle Hill's three-tiered "privilege" system, students may progress from "self-study" status to "Pioneer" status, which entitles them to a later curfew. R. 1215. To achieve "Pioneer" status, students must consistently meet their residential life responsibilities, including keeping their rooms clean and getting up on time, and their academic responsibilities, including being prepared for class and completing their homework. R. 1215. A student's advisor and an additional faculty member must

nominate the student to become a "Pioneer," and eighty percent of the faculty must vote to confirm the nomination. R. 1215. A student at "Pioneer" status may progress to a third tier, "Prefect Role," if he or she demonstrates exceptional leadership. R. 1215. "Prefect Role" is essentially a prestige status; it comes with no specific privileges. R. 1215.

Riendeau testified that Eagle Hill's mission is to "approach each student as an individual," create a program narrowly tailored to his or her needs, and foster an "intimate and encouraging learning environment." R. 1208. In an attempt to meet this mission, Eagle Hill has adopted a non-traditional schedule made up of nine separate terms, each of which is comprised of eighteen school days broken into hour-long periods. R. 1212-13. Some core curricular classes, such as math and science courses, meet as many as eight terms a year, or nearly every day of the school year. R. 735, 1213. Students may take other classes that last only a term or two. R. 735, 1213. According to Riendeau, this scheduling system makes it easier for students to take a course-load tailored to their own specific needs. R. 1213.

Riendeau testified that the mean class size at Eagle Hill is about five students, though some upper-level core curricular courses may have as many as nine or ten students a class, and phys ed classes may have as many as sixteen students. R. 1213. Two administrators conduct the school's scheduling centrally, based on students' learning styles and comments from teachers and advisors. R. 1213.

Most teachers at Eagle Hill are certified in their subject areas, though not in special education specifically. *See* R. 1209.[8] Among Eagle Hill's offerings are classes covering "pragmatic language learning," including a course titled "Seminar on Learning," which reviews theories of how different people learn. R. 1215. All students at Eagle Hill are required to complete the Seminar on Learning "as soon after they enroll as possible." R. 1215. According to Riendeau, the point of these pragmatic language learning courses is to help students identify their own educational needs and "be able to articulate those needs to others." R. 1215.

Riendeau testified that one way Eagle Hill fosters a flexible academic program is by "intentionally and carefully avoid[ing] adopting school wide instructional procedures . . . ." R. 1210. Instead, each individual teacher "has the latitude and also the responsibility to create a program that works for that student in his or her class . . . ." R. 1210. The school uses a variety of other methods to create continuity between students' classes. R. 1210. First, all faculty members meet together each morning, which, Riendeau testified, provides "an opportunity for academic advisors to bring up a student's case in particular, to ask teachers to share information, . . . to mention a difficulty, or . . . to mention something that's going very well so that others can pick up on it." R. 1211. Second, there is a regular schedule block each morning where all teachers and students are free at the same time, which allows teachers to provide individual tutoring to students or take other measures to correct the course

---

[8] The record indicates that only two of P.Z.'s teachers at Eagle Hill were certified in special education. R. 1218-20. However, neither party developed in detail what certification entails or signifies.

of a student who is struggling. R. 1211. Third, the school maintains an online commenting system on which teachers, residential faculty, and administrators can share notes about a student with their colleagues and the students' parents. R. 1211. Among the types of notes Eagle Hill's educators share are "positive" notes, documenting something that has gone well, and "callback" notes, documenting a problem, such as a failure to complete a homework assignment. R. 1212. Each student's academic advisor is responsible for proofreading and approving any comment about their advisee before it is published. R. 1224. Fourth, teachers frequently communicate with one another via e-mail. R. 1212. Fifth, first-year faculty are required to attend a week-long residential program before the start of the school year, so that all teachers at the school have training in common. R. 1210. Sixth, Eagle Hill creates a document called a "student learning profile" for each of its students. R. 272-73, 1216. This document indicates what the student's diagnosis is, where more detailed documentation about the student's evaluation can be found, what accommodations the student is entitled to, and what medical needs the student has. R. 272-73, 1216. According to Riendeau, this document is meant to be a resource "teachers can go [to] quickly to . . . understand[] at a very high level what a student's profile looks like . . . ." R. 1216.

### B.    P.Z.'s Tenth Grade Experience at Eagle Hill School

P.Z. began attending Eagle Hill in early September of 2011. R. 1282. Math teacher Tyler Blais was assigned to be P.Z.'s academic advisor. R. 1224-25. At the outset of the year, P.Z. was enrolled in the Seminar on Learning described above, Arts and Entertainment Journalism, Masterpieces of Horror, Writers' Workshop,

Algebra I, and Biology. R. 735. During his first few weeks at Eagle Hill, P.Z. was quite homesick. R. 1217. When he took the PSATs shortly after arriving at Eagle Hill, his performance was not encouraging. R. 275, 1283. He scored in the second percentile in critical reading, the seventeenth percentile in mathematics, and the thirtieth percentile in writing skills. R. 275.

However, according to Blais, P.Z. soon adjusted. R. 1225. While P.Z. was initially heavily reliant on his proctors during the evening study hall, he achieved "self-study" status after about three months. R. 1290. Relatives testified that P.Z. seemed happy and confident when he was home on visits from Eagle Hill. R. 1265-66, 1283. P.Z. spoke enthusiastically about his extra-curriculars, including golf and dogsledding. R. 1266, 1283.

At least some evidence in the record suggests that P.Z.'s difficulties adjusting to his new environs extended into the new year. For instance, in a January 13, 2012 e-mail, a school administrator wrote S.Z. to inform her that P.Z. told her he felt "suicidal" in the afternoons. R. 286. The administrator went on to note that it appeared P.Z. was simply using hyperbolic language to communicate that he felt "sad," not that he actually wanted to kill himself. R. 286. S.Z. attributes the incident to a change in P.Z.'s medication regime. R. 1283-84. Further, while P.Z. urged Blais to nominate him for "Pioneer" status in February of 2012, Blais declined to do so based on teacher comments indicating that P.Z. sometimes spoke out of turn or acted too "spontaneously" in class. R. 1229.

In March of 2012, Engelman observed P.Z. during the course of a school day at Eagle Hill. R. 758-60. In a post-observation report, she wrote that P.Z. appeared highly engaged and focused in class. R. 758-60. She also noted that he was "very independent[,] . . . the exact opposite of what I had seen in York." R. 1187. In March and April of 2012, Engelman performed a full psycho-educational reevaluation of P.Z. R. 751. As in 2010, Engelman performed the WJ-III assessment, which indicated that P.Z.'s processing speed remained in the first percentile, but that he had improved significantly as compared to his peers in reading (from twelfth percentile to twenty-sixth percentile) and writing (from seventh percentile to thirty-second percentile). R. 753-56.

Engelman's assessments of P.Z.'s reading skills showed mixed results. The GORT-4 indicated the following changes between the fall of 2010 and the spring of 2012:

|  |  | 2010 | 2012 |
| --- | --- | --- | --- |
| **Oral Reading Rate** | *Grade Level* | 8.7 | 9.2 |
|  | *Percentile* | 37 | 27 |
| **Oral Reading Accuracy** | *Grade Level* | 8.4 | 9.7 |
|  | *Percentile* | 37 | 25 |
| **Oral Reading Fluency** | *Grade Level* | 8.4 | 9.4 |
|  | *Percentile* | 25 | 37 |
| **Oral Reading Comprehension** | *Grade Level* | 6.2 | 9.4 |
|  | *Percentile* | 16 | 25 |

R. 757. The TORC-4 indicated that P.Z.'s silent reading comprehension had remained more or less the same, as compared to his peers. R. 757. The TOWL-4 indicated that

P.Z. had made moderate improvement in writing, but still struggled to include sufficient details and transitions in his compositions. R. 758.

Based on both her in-class observations and formal assessments, Engelman concluded that P.Z. had shown "significant" academic, cognitive growth since entering Eagle Hill School. R. 760. Engelman also concluded that P.Z. would continue to require placement in "small, highly structured classrooms" of no more than eight students with teachers specifically trained in language-based learning disabilities. R. 761. She determined that Eagle Hill School remained a good fit, though P.Z. did not necessarily require a residential placement. R. 761, 1190.

S.Z. testified that when she asked P.Z. about the difference between his programming at York High School and Eagle Hill School, he called York's offerings a "gimmick" and said that his time there had not taught him how to learn. R. 1284. By contrast, he said that it felt like his brain was "plugged in and turned on" at Eagle Hill. R. 1284.

P.Z.'s final grades in his courses at Eagle Hill were primarily A's and B's, and he made "honor roll" for the fourth through the sixth terms of the school year. R. 303, 735.[9] The notes P.Z. received through the school's commenting system were largely positive and included no callbacks. R. 330-37, 1225. Blais testified that P.Z. was on track to earn Pioneer status the following year. R. 1226.

---

[9] Riendeau testified that grades at Eagle Hill are based on students' ability to meet teacher's expectations and are not meant to compare one student's progress against another's. R. 1214. Riendeau also explained that a student makes "honor roll" only if he or she maintains an average of 88 or better in each class over a three-term period and never earns a grade lower than an 80. R. 1217. According to Riendeau, it takes "quite a lot commitment" to make honor roll. R. 1217.

P.Z.'s tuition to attend Eagle Hill for the 2011-2012 school year, including room and board, was $62,621.04. R. 366. Part of the reason the price tag was so high was that P.Z. applied to attend Eagle Hill too late to receive financial aid. R. 1285.

S.Z. never requested the Department convene an IEP team meeting during the 2011-2012 school year, nor did the Department convene one of its own accord. Though the December 2010 IEP called for an annual IEP review to take place on December 8, 2011, no such review took place. R. 851.

## V.    Eleventh Grade

On August 13, 2012, S.Z. filed the due process hearing request that initiated this litigation. R. 1-3A. S.Z. sought for the Department to reimburse her for P.Z.'s tuition at Eagle Hill School. R. 3.

At a resolution session held on August 23, 2012, the Department offered to bolster P.Z.'s existing IEP by: (1) providing for P.Z. to spend an additional thirty minutes a week with York High School's speech-language pathologist (for a total of sixty minutes a week); (2) providing for P.Z. to participate in a social skills and pragmatic language group; and (3) having an education consultant spend an hour with members of P.Z.'s instructional team every other week to advise them about how to provide P.Z. consistent language-based support and how to make necessary adjustments to his educational plan. R. 1037-39, 1305. Macri testified that she added the consultant to P.Z.'s IEP because S.Z. "wasn't really understanding what our program looked like" and Macri wanted "to try to rebuild a bridge that clearly has crumbled." R. 1305.

These offers are captured in a revised IEP that the Department finalized on September 18, 2012 (the "**September 2012 IEP**"). R. 1034-43. In formulating its proposal, Department officials reviewed Engelman's 2012 psycho-educational evaluation of P.Z and a progress report prepared by Eagle Hill officials. R. 716. However, the Department officials never observed P.Z. at Eagle Hill or requested to do so. R. 1313. Other than the changes mentioned above, the September 2012 IEP generally continued the programming offered in the December 2010 IEP. R. 776-787, 1034-40, 1312-13. It called for P.Z. to spend forty minutes every other day receiving specialized V & V reading instruction, to alternate between spending eighty and forty minutes in guided study in York High School's resource room each day, and to receive in-class support from ed techs in his core curricular classes. R. 1038-39, 1312-13. A "possible schedule" appended to the IEP called for P.Z. to enroll in college prep courses in history, language arts, math, and science. R. 727.

 S.Z. rejected the proposed IEP in favor of again enrolling P.Z. in Eagle Hill School. R. 1034, 1285. S.Z. testified that she felt that the September 2012 IEP was "really just more of the same thing" and that she did not believe that P.Z.'s needs could be met at York High School. R. 1034, 1285.

P.Z.'s Eagle Hill schedule for the eleventh grade called for him to take, among other courses, Geometry, Chemistry, and Textbook Study Skills. R. 340, 1231. Blais testified that P.Z. came into the eleventh grade school year already having "bought into" Eagle Hill and was doing well as of September 24, 2012, when Blais appeared

before the DPHO. R. 1227. P.Z.'s tuition and room and board at Eagle Hill for the 2011-2012 year were $55,391, accounting for financial aid. R. 366.

## PROCEDURAL HISTORY

S.Z. filed the due process hearing request that initiated this suit on August 8, 2012. R. 1-3A. With the benefit of pre-hearing briefing by both sides, the DPHO identified the following issues as properly raised:

1. Was York's IEP developed and implemented for the 2010-2011 school year reasonably calculated to provide a free, appropriate public education to the Student?

2. Was York's IEP developed for the 2011-2012 school year reasonably calculated to provide a free, appropriate public education to the Student?

3. If not, what remedies are appropriate under the Individuals with Disabilities Education Act to compensate the Student?

4. Was York's IEP developed for the 2012-2013 school year reasonably calculated to provide a free, appropriate public education to the Student?

5. If not, is the Student entitled to continue his placement at the Eagle Hill School for the 2012-2013 school year at the District's expense, or is he entitled to any other form of compensatory education?

R. 36.

The DPHO presided over a three-day hearing on September 24, 2012, September 28, 2012, and October 11, 2012. DPHO Dec. 2 (ECF No. 1-1). After the parties submitted post-hearing memos, the DPHO issued her decision, concluding that the Department failed to provide P.Z. a free appropriate public education for the ninth through eleventh grades—the 2010-2011, 2011-2012, and 2012-2013 school years. DPHO Dec. 2, 33-34; *see also* R. 1054-83 (the Department's post-hearing

memo), 1084-1131 (S.Z.'s post-hearing memo). The DPHO ordered the Department to pay S.Z. $62,621.04 both as compensatory education to make up for the failings of P.Z.'s ninth grade programming and as a tuition reimbursement for the tenth grade. The DPHO also ordered the Department pay S.Z. $55,391 as a tuition reimbursement for the eleventh grade. DPHO Dec. 33-34. The Department later filed this appeal. Compl. (ECF No. 1).

## DISCUSSION

### I.     The Governing Law

#### A.     Statutory and Regulatory Background

Congress enacted the IDEA to ensure that all children with disabilities are provided a free appropriate public education and that the rights of disabled children and their parents are protected. 20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier*, 276 F.3d at 58.

Under the IDEA, a state that elects to receive federal funding must ensure that a "free appropriate public education" is available to all qualifying disabled children who live within its borders. 20 U.S.C. §§ 1401(9), 1412(a)(1). The "primary vehicle for deliver[ing]" a "free appropriate public education" is a child's IEP, which serves as both a plan of action for school districts to follow and a legal touchstone for hearing officers and judges to assess their efforts. *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008). An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA and includes, at a minimum, statements of the disabled child's current level of

academic achievement and performance, measurable annual goals the child should be able to achieve, criteria for measuring progress toward meeting those goals, and the special education and related services the school will offer the child. 20 U.S.C. § 1414(d)(1)(A)(i).

The Maine Department of Education promulgated the Maine Unified Special Education Regulation, known as "**MUSER**," to meet the burdens the IDEA places on participating states. 05-071-101 Me. Code. R. §§ I-XIX & app. 1. Together, the IDEA and MUSER impose a number of procedural safeguards designed to protect the rights of disabled students and their parents. First, a disabled child's parents must be included in the team that formulates the child's IEP. *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008) (citing 20 U.S.C. § 1414(d)(1)(B)); 05-071-101 Me. Code. R. §§ VI(2)(B), VI(2)(I). Second, if a dispute arises concerning the content or implementation of the IEP, the disabled child's parents may demand a hearing before an impartial state hearing officer. *C.G.*, 513 F.3d at 285 (citing 20 U.S.C. § 1415(f)); 05-071-101 Me. Code. R. § XVI(13). Third, any party "aggrieved" by the hearing officer's decision may bring a civil action challenging it in state court or federal district court. 20 U.S.C. § 1415(i)(2)(A); 05-071-101 Me. Code. R. § XVI(22)(C). The court hearing the challenge must "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Among the forms of relief available are tuition reimbursement (monetary relief to pay a parent back for tuition expenses the parent incurred after unilaterally placing the child in private

school) and compensatory education (monetary or injunctive relief to allow a disabled child to obtain services to make up for educational opportunities the child missed as a result of not receiving a free appropriate public education). *See Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1, 25 (1st Cir. 2007); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 31 (1st Cir. 2006).

## B.    Standards and Scope of Review

### 1.    Free Appropriate Public Education

Generally, a state hearing officer's decision as to whether an IEP is adequate must be "made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i).[10] The burden of persuasion as to this inquiry "lies with the party challenging the IEP." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35 (1st Cir. 2012).

The IDEA defines the phrase "free appropriate public education" as follows:

The term "free appropriate public education" means special education[11] and related services[12] that—

(A)    have been provided at public expense, under public supervision and direction, and without charge;

(B)    meet the standards of the State educational agency;

---

[10]    In a limited number of circumstances, a hearing officer may find that a local educational agency failed to make a "free appropriate public education" available to a disabled child on procedural grounds. *See* 20 U.S.C. § 1415(f)(3)(E)(ii).

[11]    The IDEA defines the term "special education" to mean "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability . . . ." 20 U.S.C. § 1401(29).

[12]    Subject to certain exceptions not relevant here, the IDEA defines the term "related services" to mean "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education . . . . " 20 U.S.C. § 1401(26)(A).

(C)     include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)     are provided in conformity with the [disabled child's IEP].

20 U.S.C. § 1401(9).

This definition offers a number of pathways for a hearing officer to find, on substantive grounds, that a local educational agency failed to make a "free appropriate public education" available to a disabled child. First, a hearing officer may find that the programming offered in the child's IEP violated substantive state standards. *See* 20 U.S.C. § 1401(9)(B). Second, a hearing officer may find that the programming offered in the child's IEP was not "appropriate" as that term is used in subsection (C). *See* 20 U.S.C. § 1401(9)(C). Third, a hearing officer may find that the agency failed, in some substantive way, to implement the terms of the IEP. *See* 20 U.S.C. § 1401(9)(D).

With respect to the first of these pathways, Maine's state educational agency has adopted a substantive "least restrictive environment" ("**LRE**") standard, the "**Maine LRE Regulation**," 05-071-101 Me. Code. R. § X(2)(B), which provides that

> [t]o the maximum extent appropriate, children with disabilities . . . shall be educated with children who are not disabled, and special classes, separate schooling, or other removal of students with disabilities from the regular educational environment shall occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

05-071-101 Me. Code. R. § X(2)(B).[13]

---

[13]     The Court discusses the interplay between the Maine LRE Regulation and the IDEA provision that it tracks, 20 U.S.C. § 1412(a)(5), below, in Part II.A.2.a of this opinion.

With respect to the second pathway, the IDEA does not define the term "appropriate" as it is used in subsection (C). However, courts interpreting it have found that an IEP is "appropriate" if it is reasonably calculated to confer a meaningful, non-trivial educational benefit. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012). In this context, "appropriate" may mean something less than "ideal." *Lessard*, 581 F.3d at 23. An IEP can pass muster even if it is not "the *only* appropriate choice, or the choice of certain select experts, or the child's parents' *first* choice, or even the *best* choice." *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 948 (1st Cir. 1991). However, an IEP must, at a minimum, provide "something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs." *Lessard*, 518 F.3d at 23. To be *reasonably* calculated to confer a meaningful benefit, an IEP must, at the very least, be "individually designed." *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. Rowley*, 458 U.S. 176, 201 (1982).

With respect to the third pathway, "courts have found that 'the failure to implement a material or significant portion of the IEP can amount to a denial of [a free appropriate public education].'" *S.D. v. Portland Pub. Schs.*, No. 2:13-cv-00152-JDL, 2014 WL 4681036, at *6 (D. Me. Sept. 19, 2014) (internal citations and quotation marks omitted) (quoting *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 484 (4th Cir. 2011)). However, "perfect implementation is not necessarily required." *Id.*

### 2. Relief

In a case where a child remains in public school under an inappropriate IEP, compensatory education may be granted if additional services are necessary to make up for the local educational agency's past failures. *Mr. I. ex rel. L.I.*, 480 F.3d at 25.

In a case where a disabled child's parents unilaterally place the child in a private school because the local educational agency failed to make an appropriate IEP available in a timely manner, tuition reimbursement may be granted if the alternative placement was "proper" under the IDEA. *See* 20 U.S.C. § 1412(a)(10)(C); 20 U.S.C. § 1415(i)(2)(C)(iii); *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26 (1st Cir. 2002). The question of whether a unilateral placement is "proper" is "viewed more favorably to the parent" than the question of whether "the placement was required in order to provide a free appropriate public education . . . ." *Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 33 n.5 (1st Cir. 2001). Under this analysis, a unilateral placement must be "appropriate," 20 U.S.C. § 1401(9)(C), i.e., reasonably calculated to confer a meaningful educational benefit, *Mr. I. ex rel. L.I.*, 480 F.3d at 10, but need not be provided under public supervision, *cf.* 20 U.S.C. § 1401(9)(A), or be provided according to the terms of an IEP, *cf.* 20 U.S.C. § 1401(9)(D). *See Mr. I. ex rel. L.I.*, 480 F.3d at 24 & n.22. To be *reasonably* calculated to confer a meaningful educational benefit, the private placement must offer at least 'some element of special education services in which the public school placement was deficient,'" *id.* at 24 (quoting *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003), and may not entirely disregard the concept of "mainstreaming." *Rafferty*, 315 F.3d at 26 (quoting *Rome Sch. Comm.*, 247 F.3d at 33).

However, even if a unilateral placement is substantively "proper," a tuition reimbursement "may be reduced or denied" if the disabled child's parents failed to give the local educational agency proper notice that they would be pulling their child out of public school, if the agency properly notified the parents that it wished to reevaluate the child and the parents failed to make their child available, or "upon a judicial finding of unreasonableness." 20 U.S.C. § 1412(a)(10)(C)(iii).

### 3.    Review of an IDEA Due Process Hearing Officer's Decision

As discussed above, a court reviewing a state hearing officer's decision must receive the administrative record, hear additional evidence at the request of a party, reach a decision based on the preponderance of the evidence, and grant such relief as it determines is appropriate. 20 U.S.C. § 1415(i)(2)(C). The First Circuit has described this standard as follows:

> A district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard. We have characterized this intermediate level of review as one of involved oversight.

*D.B. ex rel. Elizabeth B.*, 675 F.3d at 35-36 (internal citations, quotation marks, and brackets omitted).

Under this standard of review, the district court "essentially conducts a bench trial based on a stipulated record, but must nevertheless give due deference to the findings of the administrative hearing officer." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir. 1993) (internal citations, quotation marks, and brackets

omitted). The court "is not at liberty either to turn a blind eye to administrative findings or discard them without sound reason," *id.*, but must instead consider the DPHO's findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue." *Town of Burlington v. Dep't of Ed. for Mass.*, 736 F.2d 773, 792 (1st Cir. 1984). Deference may be warranted, in particular, where a finding is based on educational policy judgments, *see Lessard*, 518 F.3d at 28-29, or credibility judgments. *See Sebastian M.*, 685 F.3d at 86; *Doe ex rel. Doe v. Attleboro Pub. Schs.*, 960 F. Supp. 2d 286, 294-95 (D. Mass. 2013). However, the precise amount of deference due to a DPHO "is subject to the district judge's exercise of informed discretion." *Lenn*, 998 F.2d at 1087.

## II.     Application of the Governing Law to the Facts of the Case

In this case, the DPHO made three separate determinations of liability: (1) that the Department failed to provide P.Z. a free appropriate public education during his ninth grade year at York High School, and that, as a result, S.Z. is entitled to P.Z.'s tenth grade tuition at Eagle Hill School as a compensatory education award; (2) that the Department failed to make a free appropriate public education available to P.Z. for his tenth grade year, and that, as a result, S.Z. is entitled to P.Z.'s tenth grade tuition at Eagle Hill School as a tuition reimbursement award; and (3) that the Department failed to make a free appropriate public education available to P.Z. for his eleventh grade year and that, as a result, S.Z. is entitled to P.Z.'s eleventh grade tuition at Eagle Hill School as a tuition reimbursement award.

The Court finds below that the second and third of these determinations are supported by the preponderance of the evidence in the record. Because those

determinations fully support the relief that S.Z. sought and that the DPHO granted, the Court does not reach the first determination, and thus does not analyze whether the Department failed to provide P.Z. a free appropriate public education during his ninth grade year.

### A.  Tenth Grade

#### 1.  Free Appropriate Public Education

Any inquiry into P.Z.'s educational programming during a particular period of time under the IDEA must begin with the IEP then in effect. At the start of P.Z.'s tenth grade year, the operative IEP was the December 2010 IEP. As recounted above, it called for P.Z. to remain in York High School's general population and progress through "general" and "college prep" classes with in-class assistance from ed techs and out-of-class assistance in the form of guided study halls, weekly meetings with a speech language pathologist, and forty minutes of V & V instruction every other day. Essentially, it called for the programming P.Z. received during his ninth grade year, under the similar April 2010 and December 2010 IEPs, to continue more or less unchanged. Accordingly, P.Z.'s actual experiences at York High School during his ninth grade year are uniquely probative as to whether the decision to offer the same set of services again was a reasonable educational calculation.

In describing P.Z.'s ninth grade year, the parties present vastly different pictures. S.Z. argues that P.Z. would have failed his freshman year classes if not for her nearly superhuman efforts at home; the Department contends that he was doing just fine. S.Z. testified that P.Z.'s attitude toward school was becoming increasingly negative throughout the year; the Department's witnesses testified that he was

blossoming socially. S.Z. portrays the Department's offerings as inconsistent and disjointed; the Department asserts that York High School provided P.Z. a cohesive, supportive education well-tuned to his unique needs.

In weighing the evidence, the DPHO determined that the parties' characterizations were essentially irreconcilable and ultimately concluded, based on the witnesses' live testimony and other record evidence, that the preponderance of the evidence better supported S.Z.'s view than the Department's. The record reveals a number of factors that may have influenced the DPHO in reaching this judgment. With respect to P.Z.'s day-to-day experience at York High School, the believability of the Department's witnesses was undercut by contemporaneous observations filed by the Department's speech-language pathologist, Feintuch, before litigation was contemplated. These reports showed P.Z. falling behind his peers and tuning out of his classes. With respect to P.Z.'s generally strong end-of-the-year grades, Martin conceded on cross-examination that a large portion of P.Z.'s Pre-Algebra grade was based on an amorphous evaluation of his "class participation," for which P.Z. usually received an A+, and on P.Z.'s performance on his homework, which, according to S.Z., P.Z. could not have completed without hours and hours of her help. Likewise, Macri's testimony showed that she did not know how P.Z.'s teachers arrived at their grading decisions or whether they made modifications to the grades of students on IEPs. This testimony supports an inference that the Department lacked hard-and-fast standards for assigning grades and undercuts their evidentiary significance. With respect to the Department's broad claim that the December 2010 IEP provided P.Z. with consistent

special education programming across all his classes, the record reveals that the V & V instruction the District points to was not incorporated into P.Z.'s other classes in any formal or coherent way. Further, when S.Z.'s counsel pressed Mr. Martin for details on how York High School coordinated its efforts to educate P.Z., Martin came back with little more than the fact that many of P.Z.'s teachers had classrooms in the same part of the building. With respect to the Department's claim that the December 2010 IEP provided adequate in-class support for P.Z., the IEP failed to specify with precision what kind of help P.Z.'s ed techs were required to offer or how much of their time would be focused on P.Z. as opposed to other students in his classes. The DPHO could have concluded, based on the above discrepancies and her opportunity to see the Department's witnesses testify, that their claims about the quality and cohesion of P.Z.'s programming lacked credibility—that they were, as P.Z. apparently felt, a "gimmick."

All in all, the record supports the DPHO's conclusion that P.Z. would have failed his classes if not for his mother's extraordinary, unsustainable efforts and that the December 2010 IEP, which essentially called for maintaining the status quo into P.Z.'s tenth grade year, was therefore not reasonably calculated to produce a meaningful educational benefit. Further, because this conclusion was largely based on educational judgments and on credibility judgments, it is entitled to substantial deference.[14] The preponderance of the evidence therefore supports the conclusion that

---

[14]     Though the December 2010 IEP called for P.Z.'s programming to be reviewed on December 8, 2011, that review never occurred, leaving a period of several months during P.Z.'s tenth grade year where, depending on one's characterization of the evidence, there was either no IEP in place or the December 2010 IEP remained in place despite being past due for revision. For purposes of this order,

the Department failed to make a free appropriate public education available to P.Z. for his tenth grade year.

### 2. Relief

#### a. Propriety of Unilateral Placement

Notwithstanding this failure, S.Z. is entitled to tuition reimbursement for P.Z.'s tenth grade year only if her unilateral placement of P.Z. in Eagle Hill School was "proper" under the IDEA. The DPHO determined that it was. Attacking this conclusion, the Department argues that P.Z. did not need a residential placement and that his unilateral placement in Eagle Hill therefore violated the IDEA's least restrictive environment requirement.

This argument misstates the relationship between the substantive standards the IDEA imposes on local educational agencies of its own force and those it compels states to enact. The provision regarding the LRE requirement that appears in the text of IDEA, 20 U.S.C. § 1412(a)(5), provides that states are eligible to receive federal funding only if they establish "policies and procedures" to ensure that disabled children are educated alongside their non-disabled peers "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5). To meet the funding condition stated in this provision, Maine promulgated the Maine LRE Regulation, a state standard binding on local educational agencies which tracks the provision's language. *Compare* 20 U.S.C. § 1412(a)(5) (statutory condition governing eligibility of states writ large to

---

it is immaterial which view the Court takes. The Department failed to make a free appropriate public education available during the relevant span of time in either case.

receive federal funding) *with* 05-071-101 Me. Code. R. § X(2)(B) (state education standard binding on local educational agencies). A local educational agency that falls short of the Maine LRE Regulation with respect to a particular child has necessarily failed to make a "free appropriate public education" available to that child, but only because subsection (B) of the definition of "free appropriate public education" provides that a qualifying education "must meet the standards of the State educational agency," 20 U.S.C. § 1401(9)(B), not because a placement must satisfy the Maine LRE Regulation to be considered "reasonably calculated to confer a meaningful educational benefit." *D.B. ex rel. Elizabeth B.*, 675 F.3d at 34.

The question here, though, is not whether P.Z.'s unilateral placement at Eagle Hill met Maine's educational standards. As both the Supreme Court and the First Circuit have made clear, a unilateral placement may be "proper" even if it does *not* meet state educational standards. *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 14 (1993); *Rafferty*, 315 F.3d at 26. While it is true that a proper unilateral placement may not entirely disregard mainstreaming, the record suggests that S.Z. did consider this factor and placed P.Z. in Eagle Hill only after observing him fail in mainstream classrooms, even with the support of an ed tech. Further, Eagle Hill provided P.Z. a rich, well-rounded education, with ample opportunity to learn alongside and socialize with peers and take part in extracurricular activities. The facts of this case are therefore readily distinguishable from *Rafferty*, where the First Circuit found a unilateral placement improper because it disregarded mainstreaming altogether. *Cf. Rafferty*, 315 F.3d at 26-27 (denying tuition reimbursement where

parent placed child in private school requiring child to spend five hours a day alone with an adult clinician studying a single subject).

There was ample testimony concerning the supportive environment Eagle Hill provided P.Z. and the progress he made toward independence during his time there. Further, the record indicates Eagle Hill's programming provided P.Z. some of the key aspects missing from the December 2010 IEP that rendered it inappropriate. Where the December 2010 IEP failed to meaningfully address P.Z.'s organizational needs, Eagle Hill required P.Z. to take a three-term seminar focused on the process of learning itself and implemented a study hall and privilege system that gave P.Z. both the structure and the motivation he needed to become an independent learner. Where the Department offered P.Z. little meaningful coordination from class to class, Eagle Hill's programming—including its advising system, commenting platform, faculty training, institutional focus on learning disabilities, and flexible schedule—provided P.Z. a coherent, unified education. Given the evidence in the record and the deference due to the DPHO's educational judgment, the preponderance of the evidence supports a conclusion that P.Z.'s unilateral placement at the Eagle Hill School for the tenth grade was "proper" under the IDEA.

### b.     Tuition Reimbursement

Even if a unilateral placement is pedagogically "proper," a tuition reimbursement award may be reduced "upon a judicial finding of unreasonableness," 20 U.S.C. § 1412(a)(10)(C)(iii)(III). The Department makes a stab at suggesting that S.Z. acted unreasonably by placing P.Z. in an expensive boarding school when P.Z. did not necessarily need a residential placement. The problem with this argument is

that the Department failed to elicit evidence that could support a finding that there was another "proper" option available to S.Z. which would have been more affordable and which she unreasonably rejected. While S.Z. testified that she looked at another boarding school that might have been appropriate, R. 1286, there is no evidence in the record that its tuition would have been any lower. Though S.Z. testified that she researched two other schools within driving distance of her home, R. 1286, there is no evidence that those schools' programming would have been appropriate for P.Z. Absent that sort of evidence, there is no evidentiary basis to find that it would have been possible for P.Z. to receive a "proper" education without boarding or that S.Z. acted unreasonably by failing to take advantage of such an opportunity. S.Z. is therefore entitled to a full tuition reimbursement award for P.Z.'s tenth grade year in the amount of $62,621.04.

### B. Eleventh Grade

#### 1. Free Appropriate Public Education

The DPHO found that the Department's conduct with respect to P.Z.'s eleventh grade year violated the IDEA for two reasons: (1) because the September 2012 IEP was promulgated too close to the start of the school year to be considered "timely," regardless of its content; and (2) because the September 2012 IEP was substantively inadequate. Because the Court upholds the latter of these findings, it is not necessary to address the former.

At issue is whether the September 2012 IEP was reasonably calculated to provide P.Z. a meaningful educational benefit. As the Department acknowledges, the services it offered P.Z. in the September 2012 IEP largely mirrored those it offered in

the December 2010 IEP. That largely settles the issue. The few additional services the Department included did not change the overall nature of P.Z.'s proposed program in a meaningful way. The Department's offer for P.Z. to spend an additional thirty minutes a week with a speech-language pathologist amounted to little more than minor tinkering. The Department's offer to bring in a to-be-named-later consultant to work with P.Z.'s instructors was ill-defined and appears to have been geared primarily toward mollifying S.Z., not changing the way P.Z.'s educators worked. Based on the above, the preponderance of the evidence, including the deference due to the DPHO's educational judgments and credibility determinations, indicates that the programming the Department offered P.Z. for his eleventh grade year was inappropriate for essentially the same reasons as the programming it offered P.Z. for his tenth grade year.

### 2. Relief

#### a. Propriety of Unilateral Placement

Eagle Hill offered P.Z. an extension of essentially the same basic academic program for his eleventh grade year as it provided for his tenth grade year. The preponderance of the evidence indicates that this program was a "proper" unilateral placement for the same reasons discussed above with respect to P.Z.'s tenth grade year.

#### b. Tuition Reimbursement

The Department argues that a tuition reimbursement award for P.Z.'s eleventh grade year is inappropriate because S.Z. failed to notify the Department that she intended to enroll P.Z. in Eagle Hill for his eleventh grade year prior to filing her due

process complaint. The IDEA provides that a hearing officer or judge "may" reduce a tuition reimbursement award if parents fail to inform their local school district of their intention to unilaterally place a student in a private school either at the most recent IEP meeting or ten business days "prior to the removal of the child from the public school." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).

Here, S.Z. provided such notice well before removing P.Z. from York High School, in June of 2011, and thus met the statutory notice requirement. R. 770. The Department then failed to call an IEP meeting the following year. There is no fair reading of the relevant statutes or regulations that imposes any additional notification burden on a parent in this situation. Even if there were, the statutory language is permissive, *allowing* a court to reduce a tuition reimbursement award but not *requiring* it. Here, where the Department improperly allowed P.Z.'s IEP to lapse without convening a new IEP meeting, the Court would not exercise its discretion to reduce a tuition reimbursement award. Nor does the evidence support a judicial finding that S.Z. acted unreasonably with respect to P.Z.'s eleventh grade year. S.Z. is therefore entitled to a full tuition reimbursement for the 2012-2013 school year in the amount of $55,391.

## CONCLUSION

The Court finds that the preponderance of the evidence, with proper deference to the DPHO's decision, supports a conclusion that the York School Department violated the IDEA by failing to make a free appropriate public education available to P.Z. for the 2011-2012 and the 2012-2013 school years and that S.Z. is therefore

48

entitled to have the Department reimburse her for P.Z.'s tuition at Eagle Hill School for those years. The Court therefore **AFFIRMS** the DPHO's decision with respect to those determinations. Because this finding fully supports all the relief S.Z. sought and the DPHO granted, the Court does not reach the other issues raised in the Department's appeal.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 27th day of February, 2015.